UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UMA R. KANDAN | CIVIL ACTION |
| VERSUS | NO.   24-2089 |
| ANDREA R. LUCAS AND EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | DIVISION: (3) |

## ORDER AND REASONS

Defendant Andrea R. Lucas,[1] Acting Chair of the Equal Employment
Opportunity Commission ("EEOC"), has filed a Motion for Summary Judgment.[2]
Plaintiff, Uma R. Kandan, opposes the motion.[3] For the reasons below, the motion is
denied.

## I.    Background[4]

Kandan has worked for EEOC in its New Orleans Field Office ("NOFO")[5] for
over 25 years.[6] She is an Indian born naturalized United States citizen.[7] Kandan
progressed from serving as an Investigator from 1999 to 2004, to Enforcement

---

[1] In July 2025, Andrea R. Lucas was named Acting Chair of the EEOC and was
substituted for Charlotte Burrows as a Defendant in her official capacity.

[2] R. Doc. 35; *see also* R. Docs. 40, 46.

[3] R. Docs. 36, 44.

[4] As it must at this stage, the Court "construes 'all facts and inferences in the light
most favorable to'" Kandan. *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)
(quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)).

[5] All job titles refer to the New Orleans Field Office unless otherwise specified.

[6] R. Doc. 36-6 at 3.

[7] R. Doc. 36-7, ¶ 2.

1

Supervisor/Supervisory Investigator from 2004 to 2014, and then to Enforcement Manager from 2014 to the present.[8] She also served as the Acting Field Director for about five months in 2015 and again from August 2022 to February 2023.[9] In 2022 Kandan applied for the permanent position of Field Director.[10] At the time, she held the position of GS-14[11] Enforcement Manager and was serving as Acting Field Director.[12]

Rayford Irvin, the District Director for the EEOC Houston District Office, was the selecting official for the Field Director position.[13] He was also Kandan's second-line supervisor relative to her position as Enforcement Manager and first-line supervisor when she was Acting Field Director.[14] According to one Houston EEOC employee, Irvin complained about Kandan's use of leave to visit family in India.[15] He also criticized Kandan's accent while making a head "bobble" gesture "known to be a stereotypical and racially charged reference to individuals of Indian descent."[16]

---

[8] R. Docs. 36-6 at 2–3, 36-7, ¶ 4.

[9] R. Doc. 36-7, ¶ 5.

[10] R. Doc. 35-4, ¶ 3.

[11] GS refers to the General Schedule pay system "for federal 'white-collar' employees." *United States v. Clark*, 454 U.S. 555, 556–57 (1982). "The GS is divided into 18 numbered grades; as the number of the grade increases, so do pay and responsibilities. The grades are subdivided into rates of pay or 'steps.'" *Id.* at 557.

[12] R. Doc. 36-6 at 2.

[13] R. Docs. 35-4, ¶ 2, 35-3, ¶ 1.

[14] R. Doc. 35-3, ¶ 3.

[15] R. Doc. 44-3, ¶ 7.

[16] *Id.* ¶ 6. Irvin denies making such comments. *See* R. Doc. 46-2 at 2. Kandan has

Although Irvin had chosen Kandan to serve as Acting Field Director, he claims that he did so only because he had no other leadership options.[17]

Irvin ultimately chose Michael Kirkland rather than Kandan to be Field Director.[18] Both Kirkland and Irvin are black males born in the United States with military backgrounds.[19] Kirkland joined EEOC in 2021 after a 30-year career with the U.S. Army.[20] Kirkland's last military position was as a Senior Advisor.[21] At the time that he was interviewed for the Field Director position, he had been employed by EEOC for approximately 19 months as a GS-13 Enforcement Supervisor, then 3 months as a GS-14 Supervisory Equal Opportunity Investigator.[22]

Kandan was Kirkland's direct supervisor for approximately 19 months.[23] During the COVID-19 pandemic, Kandan instructed Kirkland, like other supervisors and managers, to report to the New Orleans office in-person.[24] He ignored the

---

submitted statements from multiple EEOC employees relative to Kandan's superior qualifications for the position, Irvin's alleged discrimination against Kandan and nonparty employees, and related complaints against him. E.g., R. Docs. 44-3 at 1–3, 36-4 at 7. The Court need not consider that evidence to conclude that genuine issues of material fact preclude summary judgment.

[17] R. Doc. 35-3, ¶ 8.

[18] *Id.* ¶ 24.

[19] *Id.* ¶ 1; R. Doc. 36-4 at 8.

[20] R. Docs. 36-7, ¶ 6, 35-6 at 7, 35-7 at 10, 35-8 at 10.

[21] R. Doc. 36-30 at 3–4.

[22] R. Docs. 35-3, ¶ 4, 36-2 at 7–8, 40 at 10.

[23] R. Doc. 36-7, ¶ 7.

[24] *Id.* ¶¶ 12–13.

directive and instead reported in-person to the Houston District Office.[25] Reporting in Houston allowed Kirkland to spend significant time with Irvin.[26] Irvin later took credit for having "groomed and promoted" Kirkland to the Field Director position.[27] Kandan maintains that her non-promotion was the result of discrimination based on race, sex, and national origin.[28]

## II.    Standard of Law

### A.    Summary Judgment

Summary judgment is appropriate if a movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *S. Ins. Co. v. Affiliated FM Ins. Co.*, 830 F.3d 337, 343 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party shows "that there is an

---

[25] *Id.* ¶¶ 13–16.
[26] *Id.*
[27] R. Doc. 36-25 at 5.
[28] R. Doc. 1, ¶¶ 99–110.

absence of evidence to support the non-moving party's cause," the nonmoving party must come forward with "specific facts" showing a genuine factual issue for trial. *TIG Ins. Co. v. Sedgwick James of Washington*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Celotex*, 477 U.S. 317 at 325).

"Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Id.*; *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 419 n.54 (5th Cir. 2011); *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 807 (5th Cir. 2007). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Techs. USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson*, 477 U.S. at 248). An actual controversy exists "when both parties have submitted evidence of contradictory facts." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 750 (5th Cir. 2023) (quotation omitted).

### B.    Title VII

Under Title VII of the Civil Rights Act of 1964, it is an unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In the absence of direct evidence of discrimination, courts rely on the burden-shifting analysis set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Rogers v. Pearland Indep. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016); *Turner v. Baylor Richardson Medical Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007).

A plaintiff has the initial burden to prove a *prima facie* case of discrimination by establishing that she: (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was treated less favorably than others similarly situated outside of her protected class. *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017); *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004). If the plaintiff succeeds, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell*, 411 U.S. at 802; *Alkhawaldeh*, 851 F.3d at 426; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000). Finally, if the defendant succeeds, then the plaintiff must prove, "by a preponderance of the evidence, that the proffered reason was mere pretext for discrimination." *Byers*, 209 F.3d at 425.

## III.   Analysis

### A.   Kandan has established the *prima facie* elements of a disparate treatment claim.

Kandan meets the *prima facie* elements of a disparate treatment claim. She is within a protected class; qualified for the promotion; subject to an adverse employment decision; and treated less favorably than Kirkland, who was similarly situated and outside of her protected class. EEOC concedes that Kandan has

6

established a *prima facie* case.[29]

**B.    EEOC has produced evidence of a legitimate, nondiscriminatory reason for choosing to promote Kirkland rather than Kandan.**

The burden now shifts to EEOC to "produce evidence of a legitimate nondiscriminatory reason for the adverse employment action[.]" *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 236 (5th Cir. 2016). EEOC's burden is only one of production, not persuasion. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). This step involves no credibility assessment. *Id.*

EEOC has presented admissible evidence that the reason for Kandan's non-promotion was "largely" her significantly lower scores from an interview panel,[30] although Irvin also considered his own familiarity with the candidates' abilities.[31] These legitimate, non-discriminatory reasons are sufficient to satisfy EEOC's burden of production at this stage. *See Heinsohn*, 832 F.3d at 236.

**C.    Kandan has set forth evidence that EEOC's stated reason for Kandan's non-promotion is pretext for discrimination.**

Once an employer produces evidence of a legitimate non-discriminatory reason for a non-promotion, "the employee must produce or rely on evidence that the employer's legitimate, nondiscriminatory reason was only a pretext—that is, a false or weak reason . . . advanced to hide the actual . . . reason." *Id.* at 236–37 (quotation

---

[29] R. Doc. 35-2 at 15.
[30] R. Doc. 35-1, ¶ 14 (first citing R. Doc. 35-3, ¶ 21; then citing R. Doc. 35-3 at 19–20).
[31] R. Doc. 35-3 at 19.

omitted). Pretext may be established by showing that the plaintiff was clearly more qualified than the selected candidate or by presenting other evidence that the "employer's proffered explanation is unworthy of belief." *Maurer v. American Airlines*, 249 F. App'x. 341, 343 (5th Cir. 2007) (quoting *Reeves*, 530 U.S. at 143); *see also Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.,* 482 F.3d 408, 412 (5th Cir. 2007). Kandan relies on both methods of proof.

On this record, Kandan has not shown that she was clearly more qualified than Kirkland such that his selection alone demonstrates pretext. "Notably, the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Warren v. City of Tupelo Mississippi*, 332 F. App'x 176, 181 (5th Cir. 2009) (quotation omitted).[32] "Employment discrimination laws are 'not intended to be a vehicle for

---

[32] EEOC repeatedly argues that the "Fifth Circuit 'requires that a plaintiff show a difference in [] qualifications . . . so apparent as to virtually jump off the page and slap us in the face.'" R. Doc. 35-2 at 20 (quoting *Edwards v. Principi*, 80 F. App'x 950, 952 (5th Cir. 2003)). This argument is unhelpful because it relies on a standard that the Supreme Court rejected nearly twenty years ago. *See Churchill v. Texas Dep't of Crim. Just.,* 539 F. App'x 315, 321 (5th Cir. 2013) ("In *Ash,* the Supreme Court considered and rejected the Eleventh Circuit's formulation that '[p]retext can be established through comparing qualifications only when the disparity in qualifications is so apparent as virtually to jump off the page and slap you in the face,' because it was 'unhelpful and imprecise.'") (discussing *Ash v. Tyson*, 546 U.S. 454 (2006)).

judicial second-guessing of business decisions, nor ... to transform the courts into personnel managers.'" *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (internal citation omitted).

Kandan's extensive experience at the agency and Kirkland's equally extensive military background defy an apples-to-apples comparison. *See Price v. Fed. Exp. Corp.*, 283 F.3d 715, 723 (5th Cir. 2002) ("Paone's skill set, including his significant military, security, and leadership experience, could have reasonably outweighed Price's better education and longer tenure with the company."). The Fifth Circuit has held that "better education, work experience, and longer tenure with the company do not establish that [an applicant] is clearly better qualified, meaning that an employer has a right to depart from published job requirements and to value certain attributes over others." *Thomas v. Trico Prods. Corp.*, 256 F. App'x 658, 662 (5th Cir. 2007) (quotation omitted). Further, at least some[33] of the panel interviewers exercised impartial judgment and provided detailed and plausible reasons for ranking Kirkland higher than Kandan. This evidence shows that a reasonable person, in the exercise of impartial judgment, could choose Kirkland over Kandan.

Although a comparison of qualifications is insufficient to infer pretext on this record, Kandan has presented other evidence that a jury could conclude demonstrate

---

[33] Kandan has criticized pre-interview communications between Irvin and one of the panelists, as well as that panelist's relationship with Kirkland. There is no evidence, however, that this panelist's alleged partiality influenced the other panelists.

9

Kandan's non-promotion was discriminatory. An EEOC employee avers that Irvin made comments about Kandan's accent "as if he was unable to understand her."[34] *See EEOC v. Teleservices Mktg. Corp.*, 405 F. Supp. 2d 724, 729 (E.D. Tex. 2005) ("[N]ational origin is deemed to be inextricably intertwined with an individual's accent."). Irvin allegedly made these comments while moving his head side-to-side in a stereotyped head "bobble" in reference to Kandan's race and national origin.[35] Moreover, Irvin allegedly criticized Kandan's use of leave to visit India, referencing the travel distance and related duration.[36] A jury could find these alleged remarks demonstrate discrimination and pretext. *See Laxton v. Gap Inc.*, 333 F.3d 572, 583 (5th Cir. 2003) ("An oral statement exhibiting discriminatory animus may be used to demonstrate pretext or ... as additional evidence of discrimination.") (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225 (5th Cir. 2000)).

The application and hiring process similarly presents facts from which a jury could infer discrimination. The hiring process for the Field Director position took place over several steps. First, the Human Resources ("HR") department screened applicants to determine whether they met minimum qualification requirements.[37] If so, HR included the candidates on a Certificate of Eligibles.[38] Next, candidates were

---

[34] R. Doc. 36-28 at 4.
[35] R. Doc. 44-3, ¶ 6.
[36] *Id.* ¶ 7.
[37] R. Doc. 36-10 at 12–13.
[38] *Id.* at 13–14.

subject to a panel interview that resulted in independent scores for each candidate.[39]

Finally, a decision was made by Irvin subject to approval by the Director of the Office

of Field Programs.[40]

EEOC posted the Field Director position in August, October, and November of

2022.[41] Kandan applied in response to the August post, but she mistakenly checked

an incorrect box at some point such that an automated review found her ineligible.[42]

Kandan reached out to Irvin for clarification,[43] and Irvin suggested that Kandan

reach out to HR for an explanation.[44] Kirkland also applied but was found not

qualified based on a screening of his resume.[45]

When EEOC re-posted the position in October, Kandan again applied.[46] This

time, HR advised Kandan that while she was found eligible, her candidacy would not

be considered.[47] Later, Kandan learned that Irvin had changed the position posting

to be "Delegated Examining Unit" ("DEU"), ensuring preferential treatment for

certain qualified veterans.[48] Kandan infers that this change was intended to ensure

---

[39] *Id*. at 15; R. Doc. 36-3.
[40] R. Docs. 36-10 at 15, 36-2 at 5–6.
[41] R. Doc. 35-1, ¶ 2.
[42] R. Doc. 35-4, ¶ 4.
[43] R. Docs. 36-7, ¶ 21, 36-12.
[44] R. Doc. 36-12.
[45] R. Doc. 35-4, ¶ 5.
[46] R. Docs. 35-4, ¶¶ 7–8, 35-1, ¶ 3.
[47] R. Doc. 36-14 at 2–3.
[48] R. Docs. 36-7, ¶ 22, 35-4, ¶ 7.

Kirkland's selection.[49] Email communications suggest that Williams told Irvin that Kandan "wasn't going to make it" once the DEU designation was in place.[50]

Thomas Iwanczuk was the HR employee responsible for screening the applicants.[51] As of October 20, 2025, Iwanczuk had determined that Kirkland was not qualified.[52] A few days later, however, Irvin contacted Iwanczuk "about [the] Kirkland disqualification for the NOFO FD[] certificate" and asked to "discuss before [the] cert[ificate] is released."[53] Irvin and Iwanczuk discussed via telephone the extent to which Kirkland's military experience should count as satisfying HR's screening requirements.[54]

On October 26, 2022, Iwanczuk sought the input of Jasmine Challenger, an EEOC HR employee in Charlotte, North Carolina, relative to the screening of Kirkland's resume.[55] Challenger had expected Kirkland to join her district and expressed some surprise that he was being considered for the Houston position.[56]

Iwanczuk:    [sends PDF titled "Michael Kirkland Resume"]

Challenger:  ??

---

[49] *Id.*
[50] R. Doc. 36-14 at 2.
[51] R. Doc. 35-3, ¶ 11.
[52] R. Doc. 36-15 at 2–4.
[53] R. Doc. 36-18. Iwanczuk testified that he had not told Irvin about Kirkland's ineligibility determination. R. Doc. 36-19 at 5.
[54] R. Docs. 36-19 at 5–6, 35-3, ¶ 11, 35-4, ¶ 11.
[55] R. Doc. 36-21, 40-2, ¶13.
[56] R. Doc. 36-21.

Iwanczuk:    That current [grade] 13 that applied to the [grade] 15 Field Director

Iwanczuk:    I'm waffling a bit, but I do agree with the Director [Irvin] that the idea that the GS-15 leaders don't necessarily need to be SMEs

Challenger:   LOL!

Challenger:   He's coming over to my district

Iwanczuk:    Maybe not

Iwanczuk:    Charlotte, right? They have a backup? Lolol

Challenger:   HAHAH

Challenger:   Yep!

Challenger:   Does Charlotte have a back-up?

Iwanczuk:    I don't love the idea of people jumping grades, but the Director had great points to counter.

Iwanczuk:    Yes, I was asking if Charlotte had a back up – although it ain't happening yet anyway.

Challenger:   I don't know about Charlotte having a back-up!

Challenger:   Wait they really trying to give him the 15

Challenger:   Naw we expecting Mr. Kirkland!

Iwanczuk:    They want him to be considered

Challenger:   Not with that resume!

Challenger:   LOL![57]

---

[57] *Id.*

Kandan suggests that this exchange confirms that Kirkland was Irvin's *de facto* selection for Field Director regardless of any formal process. Iwanczuk avers that these comments were a joke and that he did not believe that Kirkland had been pre-selected.[58] Irvin and Iwanczuk have submitted supplemental declarations indicating that the conversations relative to Kirkland's candidacy were not an effort to pressure Irvin to change his decision.[59] Given the timeline and content of the communications, however, they present a genuine issue of material fact.

Iwanczuk and Kirkland eventually spoke directly about "adjustments" that should be made to Kirkland's resume to better reflect his qualifications.[60] On November 8, 2022, Kirkland submitted an adjusted resume.[61] Iwanczuk forwarded it that same day to Irvin for consideration with a note that Kirkland was now qualified.[62]

EEOC posted the position a third time in November 2022.[63] Kandan applied for the position, and HR referred both Kandan and Kirkland for consideration by Irvin.[64]

---

[58] R. Doc. 40-2, ¶ 13.
[59] *E.g.,* R. Doc. 40-1, ¶ 6.
[60] R. Doc. 36-22.
[61] R. Doc. 40-2, ¶ 15.
[62] R. Doc. 35-3, ¶ 13.
[63] R. Doc. 35-4, ¶ 2.
[64] *Id.* ¶ 16.

14

EEOC argues that the November job post reflects Irvin's openness to Kandan's candidacy because Irvin could have just hired Kirkland at this point.[65] Yet the evidence reflects that Irvin had decided to move forward with a third post *before* Kirkland submitted an updated resume—i.e., while HR still considered Kirkland unqualified based on his original resume.[66] On October 31, 2024, Iwanczuk messaged a colleague:

> I'm not sure if Rayford [Irvin] or the DRM is going to send a formal email requesting, but they would like the position reposted on the MP side. As much as I dislike the extra work, the optics of the situation and the fact that it's a GS-15 are enough reasons to want to make sure all appropriate staff are considered/interviewed.[67]

Whether the November post was about opportunity or optics is a question for the jury.

In December 2022, Kirkland and Kandan each underwent virtual panel interviews.[68] The parties debate the neutrality and fairness of that process. Shanita Williams, a manager from Irvin's Houston office, contacted Kandan to schedule her virtual panel interview.[69] Kandan was on leave in India caring for her ill elderly mother.[70] Kandan requested that the interview proceed at 9:00 a.m. Central

---

[65] R. Doc. 35-2 at 7.
[66] *See* R. Doc. 36-20 at 2; *see* R. Doc. 40-2.
[67] R. Doc. 36-20 at 2.
[68] R. Doc. 36-3 at 5. Kandan formally applied again. Kirkland apparently did not need to do so given his prior qualification by HR. R. Docs. 36-7, ¶¶ 22–24, 35-1, ¶ 3.
[69] R. Doc. 36-7, ¶ 24.
[70] *Id*.

Standard Time, which would be 8:30 p.m. local time in India.[71]  Williams advised that this option was unavailable.[72]  The interview was ultimately scheduled for 11:30 a.m. Central Standard Time, which was 11:00 p.m. local time in India.[73] Irvin avers that he was unaware of the scheduling issue until after interviews were completed,[74] although the current record permits an inference that Irvin knew Kandan was on leave in India at the time.[75]

Irvin assembled an interview panel consisting of four EEOC managers.[76] Although the process requires a neutral panel, Kandan highlights that Irvin had previously communicated with one panel member (whom Kirkland had known for about thirty years and had been stationed with in the military) relative to Kandan's perceived lack of readiness for the permanent field director position.[77]  Kandan could not review her online EEOC work materials to prepare for the interview because she

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] R. Doc. 40-1, ¶ 8.

[75] Irvin was aware that Kandan was in India when the interviews would go forward. R. Doc. 44-3, ¶ 7 (averring that Irvin was critical of Kandan's use of leave to visit India).

[76] R. Docs. 35-3, ¶ 16, 35-7, ¶ 2, 35-8, ¶ 2.

[77] R. Docs. 46-1 at 2–4, 44-1 at 4. The communication at issue between Irvin and another panel member (before he was placed on the panel) focuses on whether Kandan needed more time as acting field director before she could be considered for the field director position. R. Docs. 36-13 at 2, 35-8, ¶ 8. EEOC maintains this demonstrates Irvin wished to help Kandan with her candidacy. R. Doc. 35-2 at 6, 10. Kandan suggests that Irvin was priming the panelist by "strongly impl[ying]" that she was not ready to be Field Director. R. Doc. 36 at 12.

did not have access while overseas.[78] During the interview, Kandan spoke quietly so as not to wake her sleeping ill mother "in the next room of a very small house."[79] Three of the four panelists rated both Kirkland and another candidate higher than Kandan.[80] The fourth awarded an equal score to Kandan and Kirkland.[81] In short, the virtual interview did not go well for Kandan. Kandan was not overly concerned, however, because EEOC's practice was to conduct a second interview.[82] That did not occur.[83]

Irvin relies heavily on the panel scores to justify his promotion decision. He testified that he would have chosen Kandan if she had the highest interview scores.[84] He also testified that he generally "go[es] with" a panel's recommendation.[85] Kandan has produced evidence, however, that Irvin previously selected a candidate who placed third in panel scoring.[86] Moreover, Irvin prepared an internal self-assessment

---

[78] R. Doc. 36-7, ¶ 25.

[79] *Id.*

[80] R. Doc. 35-9.

[81] *Id.*

[82] R. Doc. 36-7, ¶ 25.

[83] *Id.*

[84] R. Doc. 44-2 at 7:12–20.

[85] *Id.* at 4:2–11.

[86] R. Doc. 44-3, ¶ 5. This decision allegedly reflects a close relationship between the candidate ranked third yet selected and Irvin's office manager, Williams. EEOC challenges the admissibility of this testimony on the basis that there is no indication of how the witness would have firsthand knowledge of other panelists' scores. R. Doc. 46 at 5–6. EEOC is silent as to whether the information about the prior panel is accurate. If Irvin did, in fact, select a third-ranked candidate, then this information

that stated he "groomed and promoted" Kirkland to the Field Director position, calling into question the extent to which the panel scores motivated his decision.[87] Taken collectively, the evidence presents a question of fact as to whether "the employer's proffered explanation is false or unworthy of credence" and that discrimination motivated his decision. *Churchill v. Texas Dep't of Crim. Just.*, 539 F. App'x 315, 318 (5th Cir. 2013) (quotation omitted).

## IV.    Conclusion

Accordingly, for the foregoing reasons,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (R. Doc. 35) is **DENIED**.

New Orleans, Louisiana, this 20th day of September.

_____
EVE J. DOSSIER
UNITED STATES MAGISTRATE JUDGE

---

can be presented via admissible form at trial through a witness (e.g., Irvin or a prior panel member) knowledgeable about the prior panel's recommendation and Irvin's decision. *See Patel v. Texas Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019).

[87] R. Doc. 36-25 at 5.